UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| Rear Adm. James J Carey [Ret]                 ) | |
| 6022 Knights Ridge Way                          ) | |
| Alexandria, VA 22310                             ) | |
| ) | |
| Kelly S. Eustis                                        ) | |
| 1431 Q Street                                          ) | |
| Apt. 130                                                 ) | |
| Sacramento, California 95811                   ) | |
| ) | |
| National Defense Political                       ) | |
| Action Committee                                   ) | |
| 6022 Knights Ridge Way                          ) | |
| Alexandria, VA 22310                             ) | |
| ) | |
| Plaintiffs,            ) | |
| ) | |
| v.                       )      Civil Case No. _____ | |
| ) | |
| FEDERAL ELECTION COMMISSION   ) | |
| 999 E Street, NW                                     ) | |
| Washington, DC 20463,                           ) | |
| ) | |
| Defendant.         ) | |
| _____ ) | |

_____

MOTION FOR PRELIMINARY INJUNCTION
_____

Plaintiffs move for a preliminary injunction pursuant to Fed. R. Civ. P. 65. Plaintiffs file their Verified Complaint for Declaratory and Injunctive Relief and Memorandum in Support of Preliminary Injunction Memo concurrently.

As described in the Verified Complaint and Memorandum, Plaintiffs complain against the unconstitutionality of 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) as applied to contributions given to National Defense PAC and as applied to independent expenditures created by National Defense PAC, including those described in EXHIBIT F to the Verified Complaint.

Plaintiffs have established probable success on the merits, demonstrating that they will be irreparably harmed, that an injunction will not substantially harm the Defendant, the Federal Election Commission, that an injunction serves the public interest, and there is no adequate remedy at law.  Because a preliminary injunction sets forth no monetary risk to the FEC, Plaintiffs request that any bond requirement should be waived.

In accord with Local Rule of Civil Procedure 65.1(c), Plaintiffs have filed a Verified Complaint contemporaneously with this request for injunctive relief.  Verified Complaints are the legal equivalent of an affidavit.  *See Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992); *Mallick v. Int'l Broth. of Elec. Workers*, 814 F.2d 674, 680 (D.C. Cir. 1987).  In addition, pursuant to Local Rule 7(m), Plaintiffs have conferred with legal counsel for the FEC concerning whether these provisions should be subject to preliminary injunctive relief.  The response of the FEC is included in Plaintiffs' Notice of Consultation on Motions.

As detailed in the accompanying Memorandum, Plaintiffs request that this court grant its preliminary injunction motion and preliminarily enjoin the FEC from enforcing 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) as applied to contributions to National Defense PAC and as applied to independent expenditures created by National Defense PAC, until a final hearing on the merits of this matter.

Respectfully submitted,

Dan Backer (DC Bar No. 996641)
PO Box 75021
Washington, DC 20013
202.210.5431
dbacker@dbcapitolstrategies.com

Stephen M. Hoersting*
700 E Schantz Ave
Dayton, OH 45419
937.623.6102
hoersting@gmail.com

Benjamin T. Barr*
10737 Hunting Lane
Rockville, MD 20850
240.863.8280
benjamin.barr@gmail.com

*Motions for *Pro Hac Vice* to be filed.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
REAR ADM. JAMES J. CAREY (Ret.),        )
                                        )
NATIONAL DEFENSE PAC, and               )
                                        )
KELLY S. EUSTIS,                        )
                                        )
                    Plaintiffs,         )
                                        )
            v.                          )        Civil Case No. _____
                                        )
FEDERAL ELECTION COMMISSION,            )
                                        )
                    Defendant.          )
_____)


_____

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**
_____

Dan Backer (D.C. Bar No. 996641)
P.O. Box 75021
Washington, DC 20013
202.210.5431
dbacker@dbcapitolstrategies.com

Stephen M. Hoersting*
700 E Schantz Ave
Dayton, OH 45419
937.623.6102
hoersting@gmail.com

Benjamin T. Barr*
10737 Hunting Lane
Rockville, MD 20850
240.863.8280
benjamin.barr@gmail.com

*Attorneys for Plaintiffs*

*Motions for *Pro Hac Vice* to be filed.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES……………………………………………… iv

**INTRODUCTION**……………………………………………………. 1

**STATEMENT OF FACTS**………………………………………… 1

    **I.**    **The Advisory Opinion Request**.................................................. 3

    **II.**    **Ensuing Harm to Plaintiffs**…………………………………….. 5

    **III.**    **Ongoing Harm to Plaintiffs**…………………………………… 6

    **IV.**    **National Defense PAC's Structure and Operations**…………… 8

    **V.**    **Rear Admiral Carey and Kelly S. Eustis's Activities**………….. 10

**ARGUMENT**………………………………………………………… 11

    **I.**    **Plaintiffs are Substantially Likely to Succeed on the Merits**…... 12

        **A. The Very Structure of the Federal Election Campaign Act Illustrates That Contribution Limits Applied Against Non-Connected Committees' Independent Expenditures Cannot Be Upheld**………………………………………… 13

            **1.**    *CalMed* **Does Not Support the Conclusion That A Non-Connected Committee's Independent Expenditures Corrupt Candidates**………………….. 16

            **2.**    **A Connected Organization and Its Separate Segregated Fund (SSF) May Be Separate Legal Entities, But That Does Not Mean Separate Accounts Do Not Stem Corruption in Non-connected Committees**……………………………………..... 19

        **B. As a Matter of** *Stare Decisis***, National Defense PAC's Rights Have Already Been Upheld**………………………….. 21

        **C. The FEC Cannot Demonstrate a Compelling State Interest in Limiting Contributions to National Defense PAC's Independent Expenditures**………………….. 22

**D. As Applied to National Defense PAC and Its Contributors, the Contribution Limits Are Not Narrowly Tailored**……………………………………….. 27

**II.     Plaintiffs Will Suffer Irreparable Harm Without an Injunction**…………………………………………………… 29

**III.    An Injunction Will Not Substantially Injure Others**…………… 30

**IV.     An Injunction Will Further the Public Interest**………………… 31

**V.      Plaintiffs Have Standing to Seek the Injunction**……………….. 32

**VI.     The Court Should Waive the Bond Requirement Under F.R.C.P 65(c)**……………………………………………… 33

**CONCLUSION**……………………………………………………….... 34

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ashcroft v. ACLU,* 542 U.S. 656 (2004)………………………………… 12

*Austin v. Michigan Chamber of Commerce,*
494 U.S. 690 (1990), *rev'd. Citizens United v. FEC,*
130 S. Ct. 876 (2010)………………………………………………….. 15

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)…….. 32

*\*Buckley v. Valeo,* 424 U.S. 1 (1976)…………………………………… 14, 22, 23, 24,
26, 27

*\*California Medical Association v. FEC,* 453 U.S. 182 (1981)…………. 16, 17, 18, 19,
21, 27, 30, 31

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995)………….. 32

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006)…………………………………………… 12, 29

*\*Citizens Against Rent Control v. Berkeley,* 454 U.S. 290 (1981)………. 13, 22, 23, 24,
25, 26, 30

*Citizens United v. FEC,* _ U.S. _; 130 S. Ct. 876 (2010)………………… 2, 14, 15, 16,
19, 22, 26, 29

*Cobell v. Norton,* 225 F.R.D. 41 (D.D.C. 2004)………………………… 34

*Comm. on Jobs Candidate Advocacy Fund v. Herrera,* 07-03199,
2007 U.S. Dist. LEXIS 73736 (N.D. Cal. Sept. 20, 2007)………………. 34

*Democratic Senatorial Campaign Committee v. FEC,*
918 F. Supp. 1 (D.D.C. 1994)……………………………………………... 5

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)……………………………. 32

*Elrod v. Burns,* 427 U.S. 347 (1976)…………………………………….. 28

*\*EMILY's List v. FEC,* 581 F.3d 1 (D.C. Cir. 2009)………………………. 2, 11, 12, 16,
21, 22, 24, 25

*FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986)………. 23, 27

*FEC v. Nat'l Conservative Political Action Comm.,
 470 U.S. 480 (1985)……………………………………………… 13, 22, 23, 24,
                                                               25, 26, 27, 28

FEC v. Nat'l Rifle Ass'n of Am., 254 F.3d 173 (D.C. Cir. 2001)…………. 33

FEC v. Wisc. Right to Life, Inc. 551 U.S. 449 (2007)………………… 27, 30

First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 (1978)……………… 23

Garrison v. Louisiana, 379 U.S. 64 (1964)……………………………….. 30

Gonzales v. O Centro Espirita Beneficente Unaio do Vegetal,
546 U.S. 418 (2006)………………………………………………………… 12

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)……………………... 31

Marks v. United States, 430 U.S. 188 (1977)……………………………… 18

McConnell v. FEC, 540 U.S. 93 (2003)…………………………………… 14

Mills v. Alabama, 384 U.S. 214 (1966)…………………………………… 30

NAACP v. Alabama, 357 U.S. 449 (1958)………………………………… 23

N.C. Right to Life, Inc. v. Leake, 482 F. Supp. 2d 686 (W.D. N.C. 2007)… 28

N.Y. Times v. Sullivan, 376 U.S. 254 (1964)……………………………… 31

Nixon v. Shrink Missouri Government PAC, 528 U.S. 377 (2000)……….. 13

Odgen v. Marendt, 264 F. Supp. 2d 785 (S.D. Ind. 2003)……………….. 34

Randall v. Sorrell, 548 U.S. 230 (2006)………………………………….. 26, 27

Smith v. Bd. of Election Comm'rs, 591 F. Supp. 70 (N.D. Ill. 1984)……… 34

SpeechNow.org v. FEC, 599 F.3d 686 (D.C. Cir. 2010)…………………... 2, 13

Temple Univ. v. White, 941 F.2d 201 (3d Cir. 1991)……………………… 34

Unity '08 v. FEC, 596 F.3d 861 (D.C. Cir. 2010)…………………………. 5, 33

Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383 (1988)………. 32

Virginia Soc'y for Human Life, Inc. v. FEC,

263 F.3d 379 (4th Cir. 2001)……………………………………………… 32, 33

**Codes, Rules and Statutes**

Bipartisan Campaign Reform Act of 2002,
Pub. Law 107-155 (Mar. 27, 2002)………………………………………14

F.R.C.P. 65(c)…………………………………………………………..  33

2 U.S.C. § 431(17)…………………………………………………… 9

2 U.S.C. § 437g………………………………………………………. 5

2 U.S.C. § 437f……………………………………………………….. 3, 5, 12

2 U.S.C. § 441a(a)(1)(C)…………………………………………………passim

2 U.S.C. § 441a(a)(3)………………………………………………passim

11 CFR 100.5………………………………………………………………20

11 CFR 102.5………………………………………………………………20

11 CFR 109…………………………………………………………………9

11 CFR 112.1………………………………………………………………4

11 CFR 112.4………………………………………………………………4, 5

11 CFR 104…………………………………………………………………20

72 Fed. Reg. 32,160 (July 7, 2009)……………………………………… 5

## INTRODUCTION

This case is a constitutional challenge to laws that, as interpreted by the Federal Election Commission ("FEC" or "Commission"), prevent plaintiffs from joining together to exercise their First Amendment rights to speech and association. Plaintiff National Defense PAC is a non-connected political action committee that plans to make contributions to candidates for federal office and independent expenditures in support of, or in opposition to, candidates for federal office. Specifically, it plans to distribute banner advertisements over various websites during the 2012 election cycle in the districts of congressional candidates that hyperlink to pages containing material expressly advocating the election or defeat of these candidates. National Defense PAC and its Chairman, Retired Rear Admiral James J. Carey, have prepared scripts for such ads and are prepared to raise funds to support their distribution. Plaintiff Kelly S. Eustis is willing and able to contribute $6300 this year to the independent expenditure advertising campaign. Contribution limits at 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3), however, and more specifically their incorrect interpretation by the FEC, prevent National Defense PAC from accepting the individual Plaintiffs' contributions and thus prevent it and its supporters from exercising their rights to speech and association. Plaintiffs are entitled to a preliminary injunction that prevents the FEC from enforcing those laws against the Plaintiffs.

## STATEMENT OF FACTS

Plaintiff Rear Adm. James J. Carey (Ret.) is a registered voter residing in Alexandria, Virginia, and the founder and treasurer of National Defense PAC. Verified Complaint at ¶ 8 [hereinafter "VC"]. He has served in that capacity since 2000. *Id.*

Plaintiff National Defense PAC is a non-partisan, non-connected political action committee registered with the Federal Election Commission with its principal mailing address in Washington, DC.  *Id.* at ¶ 10.  Plaintiff Kelly Eustis is a registered voter who resides in Sacramento, California, *id.* at ¶9, and wishes to associate and speak with National Defense PAC.

A group of military veterans established National Defense PAC with the desire to promote shared patriotic values in government.  National Defense PAC advocates in favor of limited government, upholding a national commitment to this nation's veterans, and publicly defends the rights of American soldiers.  In this role, National Defense PAC raises and expends funds in support of candidates for federal office who are military veterans and agree with its values.  Such funds are raised subject to the amount and source limits detailed at 2 U.S.C. § 441a(a)(1)(C).  VC at ¶ 12.  National Defense PAC makes contributions to candidates for federal office up to the applicable limit and would like to make independent expenditures in support or opposition of candidates.

In the wake of what most legal experts have deemed a sea change in election law through *Citizens United v. FEC*, 130 S.Ct. 876 (2010), *SpeechNow.org v. Federal Election Commission,* 599 F.3d 686 (D.C. Cir. 2010), and *EMILY's List v. Federal Election Commission*, 581 F.3d 1 (D.C. Cir. 2009), plaintiffs hoped to secure and use to the fullest extent of their recently recognized, but always existing, First Amendment rights in two separate ways.  First, National Defense PAC sought to engage in independent expenditure campaigns, that is, campaigns advocating the election or defeat of clearly identified candidates for federal office.  Part and parcel of National Defense PAC's ability to engage in this speech is its ability to raise funds to make such

independent expenditures, including the cost of production and distribution through radio, television, the Internet, and print media.   Thus, National Defense PAC sought, as recognized in *EMILY's List* and elsewhere, to be free of contribution limits for donations given for its independent expenditure campaigns.  VC at ¶ 13.  At the same time, Kelly S. Eustis desired to associate and speak with National Defense PAC by giving more than $5,000 per calendar year to fund such independent expenditure campaigns.   National Defense PAC sought to maintain a separate bank account from which to solicit and accept contributions for candidates subject to source and amount limits.

While the *SpeechNow*, *EMILY's List*, and *Citizens United* courts could not have been clearer in protecting these rights, the FEC caused and continues to cause injury to the speakers before this court.

I.      **The Advisory Opinion Request**

On August 11, 2010, National Defense PAC submitted an advisory opinion request ("AOR"), attached as EXHIBIT A, to the FEC pursuant to 2 U.S.C. § 437f.  This request asked whether its actions would be lawful if it:

    a.  Accepted unlimited contributions from individuals, other political committees, corporations, and unions for the express purpose of making independent expenditures, including paying any or all of its own administrative and operating expenses, and

    b.  Accepted contributions from individuals and other political committees only, subject to the limits at 2 U.S.C. §§ 441a(a)(l)(C) and (2)(C), to expend as campaign contributions to candidates, pursuant to 2 U.S.C. § 441a(a)(2), and

    c.  Recorded and segregated all such contributions by type and maintained separate bank accounts for each type, applying for the purpose of campaign contributions only those contributions expressly made for that purpose as indicated by the contributor at the time of the contribution and subject to the limits at 2 U.S.C. §§ 441a(a)(l)(C) and (2)(C).

3

*See* VC at ¶ 15.

Pursuant to 11 C.F.R. § 112.1, the FEC accepted the AOR for review, assigned it AOR number 2010-20, and posted it on the FEC's website for public commentary on August 11, 2010.  VC at ¶ 16.

On September 17, 2010, the FEC's general counsel issued a draft advisory opinion in response to National Defense PAC's AOR. The draft advisory opinion, Draft A, concluded that contributions to National Defense PAC made to finance its independent expenditures would be subject to the contribution limits of 2 U.S.C. § 441a(a)(1)(C) and related FEC regulations.  VC at ¶ 17.  This "Draft A" advisory opinion is attached to the Verified Complaint as EXHIBIT B.

An alternate draft, Draft B, was issued on September 21 and concluded that contributions to National Defense PAC made and used exclusively to finance its independent expenditures would not be subject to the contribution limits of 2 U.S.C. § 441a(a)(1)(C) and related FEC regulations.  VC at ¶ 18.  The alternative "Draft B" advisory opinion is attached to the Verified Complaint as EXHIBIT C.

On September 23, 2010, at an open meeting of the FEC, the Commission failed by a vote of 2-3 to approve Draft A.  The Commission also failed by a vote of 3-2 to approve Draft B.  VC at ¶ 19.

Pursuant to 11 C.F.R. § 112.4(a), the FEC certified on September 28, 2010 that it was unable to approve National Defense PAC's AOR because it lacked the necessary four votes to approve the AOR.  VC at ¶ 20.  This certification is attached to the Verified Complaint as EXHIBIT D.  The FEC's failure to affirmatively provide a four-vote, binding advisory opinion in response to National Defense PAC's request carries the

4

equivalent legal effect that its proposed actions would be invalid under the FECA and subject the organization to civil or criminal penalties under 2 U.S.C. § 437g for speaking out about candidates and otherwise engaging in political association.

The Commission's inability to issue an advisory opinion deprives plaintiffs that requested it of a legal reliance defense that they could otherwise receive under 2 U.S.C. § 437f(c).  The advisory opinion process in this matter is complete and deprived plaintiffs of a legal right – to engage freely in constitutionally protected speech and association. *See Unity 08 v. Federal Election Commission*, 596 F.3d 861 (D.C. Cir. 2010) ("parties are commonly not required to violate an agency's legal position and risk an enforcement proceeding before they may seek judicial review"); *see also Democratic Senatorial Campaign Committee v. Federal Election Commission*, 918 F. Supp. 1 (D.D.C. 1994).

**II.      Ensuing Harm to Plaintiffs**

At the time of filing the advisory opinion request, several primary elections were less than 60 days away.  VC at ¶ 22.  National Defense PAC filed its request as promptly as possible to ensure that its planned speech and association would be deemed lawful under the FECA and related regulations.  Because the elections were so close upon it, National Defense PAC asked for an expedited advisory opinion request pursuant to 11 C.F.R. § 112.4(b) and 72 Fed. Reg. 32,160 (July 7, 2009).  More than 40 days later, the Commission decided not to issue an advisory opinion.  VC at ¶ 22.  Given that the FEC could not issue a definitive statement concerning the legality of National Defense PAC's planned actions, it was forced to mute itself and curtail its activities during the 2010 election cycle.  *Id.*

During the 2010 electoral cycle, National Defense PAC planned to deploy independent expenditure communications in support of endorsed candidates nationwide, and in opposition to their opponents.  While National Defense PAC was free to endorse its preferred candidates, it was not legally permitted to solicit more than $5,000 per person per calendar year to fund independent expenditure campaigns for them.  These proposed campaigns included focusing on candidates in the Eighth Congressional District of Michigan, the First Congressional District of Rhode Island, the Eighth Congressional District of Massachusetts, the Ninth Congressional District of New York, and the First Congressional District of Hawaii.  *See* VC at ¶ 23.  A copy of National Defense PAC's endorsements in these campaigns is attached to the Verified Complaint as EXHIBIT E. Because the FEC did not permit it to accept unlimited contributions to fund its independent expenditures, National Defense PAC was unable to gather the resources necessary to run independent expenditure campaigns and to be heard during the 2010 electoral cycle. *Id.*

### III.  Ongoing Harm to Plaintiffs

As soon as possible, and certainly before the 2012 primary and general elections, National Defense PAC would like to make independent expenditures from its general fund, in various amounts, expressly advocating for or against clearly identified candidates of its choice.  VC at ¶ 24.  A specific example of this is included as EXHIBIT F, which includes a proposed advertisement for Newsmax – a popular Internet destination – expressly advocating against the retention of Anthony Weiner in New York's Ninth Congressional District.  This advertisement, with a guaranteed 50,000 views per week, would cost $6,300.00 to run in the months leading up to the November 2012 elections.

The advertisements in question would include a picture of Anthony Weiner along with the call to "defeat Anthony Weiner" – asking users to click on the advertisement to learn more.  *See* VC ¶ 24, EXHIBIT F.

National Defense PAC would like to make additional independent expenditures in the months leading up to the 2012 primary and general elections based on issues and candidates that present themselves.  VC at ¶ 25.  Without the ability to solicit unlimited contributions to fund such communications, it will not be able to speak during the 2012 electoral season.  Without an immediate ruling from this court, National Defense PAC will not have the necessary time to fundraise and generate support for its message from likeminded individuals.

Before the 2012 primary and general elections, National Defense PAC would like to solicit donations for its independent expenditures in amounts greater than $5,000.00 per calendar year.  VC at ¶ 26.  National Defense PAC has contacted donors willing to give more than $5,000.00 in single donations to fund independent expenditures, but has not solicited or accepted such amounts due to the effect of 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).  VC at ¶ 26.  A specific example of this is included as EXHIBIT G, a letter of intent from Kelly S. Eustis, who wishes to donate $6,300.00 to help fund independent expenditure communication campaigns against Anthony Weiner but cannot due to the current operation and interpretation of the law by the FEC.  *Id.*

As soon as possible, Kelly S. Eustis would like to make a $6,300.00 contribution to National Defense PAC to help fund independent expenditure communications against Anthony Weiner in the Ninth Congressional District of New York.  VC at ¶ 27.  But for

the operation and FEC interpretation of 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3), Mr. Eustis would make such a contribution.  VC at ¶ 28.

As soon as possible, and certainly before the 2012 primary and general elections, National Defense PAC would like to make contributions to candidates for federal office subject to source and amount limits found at 2 U.S.C. §§ 441a(a)(1)(C)  and (2)(C). Because it plans to make unlimited independent expenditures while receiving unlimited donations for them, current interpretation of the law by the FEC prohibits National Defense PAC from making source and amount limited contributions out of a separate bank account.  VC at ¶ 28.

National Defense PAC would like to receive contributions to fund candidate contributions, subject to source and amount limits found at 2 U.S.C. §§ 441a(a)(1)(C). Because it plans to make unlimited independent expenditures while receiving unlimited donations for them, current operation and interpretation of the law by the FEC prohibits it from concurrently soliciting and receiving limited contributions to make contributions to candidates.  Were it permissible, National Defense PAC would actively fundraise and accept contributions for making candidate contributions.  VC at ¶ 29.

## IV.    National Defense PAC's Structure and Operations

National Defense PAC is an unincorporated association registered as a non-connected political action committee with the FEC.  VC at ¶ 30.  The PAC operates independently of political candidates, committees, and political parties.  *Id.* National Defense PAC does not coordinate any of its activities with candidates or national, state, district or local political party committees or their agents as defined in 2 U.S.C. §§

441a(a)(7)(B) and (C) and 11 C.F.R. § 109.  VC at ¶ 30.  In addition, National Defense

PAC does not and will not coordinate its activities with other political committees.  *Id.*

National Defense PAC's expenditures for advertisements will be "independent

expenditures" under 2 U.S.C. § 431(17) because they will be expenditures by a person

"expressly advocating the election or defeat of a clearly identified candidate" that are

"not made in concert or cooperation with or at the request or suggestion of such

candidate, the candidate's authorized [campaign] committee, or their agents, or a political

party committee or its agents."  VC at ¶ 31.  An example of a proposed future

independent expenditure is attached to the Verified Complaint as EXHIBIT F.

National Defense PAC has not yet solicited or accepted any contributions in

excess of the $5000 limit imposed by 2 U.S.C. § 441a(a)(1)(C), because doing so would

subject it to civil and criminal penalties.  VC at ¶ 32.

The contribution limits contained in 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3)

prevent National Defense PAC from accepting the contributions from Kelly S. Eustis,

VC at ¶ 33, and prevent National Defense PAC from soliciting additional contributions

above those limits.  VC at ¶ 34.  Even if National Defense PAC could somehow raise

enough money in increments of $5000 or less per donor per calendar year to pay for its

advertisements, the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and

441a(a)(3) would, by making it harder to gather funds, limit the type and number of times

it could run advertisements.  VC at ¶ 35.  The limits would also diminish National

Defense PAC's ability to run additional advertisements concerning other federal

candidates in other races.  This is precisely the muting effect the law had on National

Defense PAC's operations during the 2010 electoral cycle as described above. This constitutes a direct impediment on National Defense PAC's association and speech.

National Defense PAC will face a credible threat of prosecution if it solicits or accepts contributions in excess of the limits contained in 2 U.S.C. §§441a(a)(1)(C) and 441a(a)(3) to fund its advertisements as described herein. VC at ¶ 36.

## V.      Rear Admiral Carey and Kelly S. Eustis's Activities

The contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) prevent plaintiff Kelly S. Eustis from making the contributions he wants to make as described above, and thus prevents him from associating with National Defense PAC and with other like minded individuals, as well as speaking, for the purpose of producing and distributing the advertisements described herein. VC at ¶ 37.

Similarly, the contribution limits found in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) prevent Rear Admiral Carey, as an agent of National Defense PAC, from soliciting or accepting contributions as described above. VC at ¶ 38.

Plaintiff Kelly S. Eustis will face a credible threat of prosecution if he makes donations to National Defense PAC in excess of the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to fund National Defense PAC's advertisements as described herein. VC at ¶ 39. Mr. Eustis should not have his contributions to National Defense PAC count against the amount of money he may contribute to federal candidates under 2 U.S.C. § 441a(a)(3).

Plaintiff Rear Admiral Carey will face a credible threat of prosecution if he solicits or accepts donations to National Defense PAC in his role as treasurer in excess of

the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to fund National

Defense PAC's advertisements as described herein.  VC at ¶ 40.

## ARGUMENT

Just fifteen months ago, the United States Court of Appeals for the District of

Columbia Circuit held that non-connected political action committees that receive dollar-

limited and source-restricted contributions to in turn make contributions to candidates

also have the *First Amendment* right to receive unlimited funds for independent

expenditures.  *EMILY's List v. Federal Election Commission,* 581 F.3d 1, 12 (D.C. Cir.

2009).  A non-connected committee that "makes independent expenditures to support

federal candidates does not suddenly forfeit its *First Amendment* rights when it decides

also to make direct contributions to parties or candidates."  *Id.*  National Defense PAC is

a similarly-situated non-connected political action committee whose identical rights

under the First Amendment have not been recognized by the Federal Election

Commission.

Despite *EMILY's List's* holding, the Federal Election Commission failed four

months ago to find four votes to guide the National Defense PAC in its advisory opinion

request.  *See* Certification of FEC Recording Secretary Shawn Woodhead Werth, AO

2010-20 (September 28, 2010) (hereinafter "Certification") VC, EXHIBIT D.  Three of

the Commission's six members rightly understood that they were bound by the reasoning

of *EMILY's List.  See* FEC Agenda Document No. 10-60-B (adopting reasoning of

opinion), VC at EXHIBIT C.  Two commissioners voted otherwise, and the sixth left the

proceedings prior to the vote.  *See* Certification, VC EXHIBIT D.   The Commission's

failure to follow *EMILY's List,* and the Supreme Court precedents that comprise it, leaves

plaintiffs with the unmistakable conclusion that they will be liable if they accept funds for independent expenditures in excess of the $5000 contribution limit of 2 U.S.C. § 441a(a)(1)(C). *See* 2 U.S.C. § 437f. Plaintiffs seek to preliminarily enjoin contribution limits that, if applied exclusively to National Defense PAC's independent expenditure activities, will prevent plaintiffs from exercising their rights to speech and association during the time those rights are most effective—the election season.

To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). As demonstrated below, each of these factors weighs in plaintiffs' favor.

## I.      Plaintiffs Are Substantially Likely Succeed on the Merits

The burden of proof at the preliminary injunction stage tracks the burden of proof at trial. Therefore, where First Amendment rights are at stake, the FEC must demonstrate the likelihood that the law will be upheld. *See Gonzales v. O Centro Espirita Beneficente Unaio do Vegetal,* 546 U.S. 418, 429 (2006); *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004). In this context, the FEC must demonstrate that the contribution limits further either a compelling or substantial governmental interest as applied to plaintiffs. Whether the standard of review for limits on contributions to National Defense PAC's independent expenditures is tested under the strict scrutiny applicable to restrictions on expenditures, *see FEC v. Nat'l Conservative Political Action Committee,* 470 U.S. 480 (1985) *("NCPAC"),* the exacting scrutiny discussed in *Citizens Against Rent Control v.*

*Berkeley,* 454 U.S. 290 (1981), or the "less rigorous review" applicable to limits on contributions to candidates, *see Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000), the FEC cannot meet its burden.

A.   **The Very Structure of the Federal Election Campaign Act Illustrates That Contribution Limits Applied Against Non-Connected Committees' Independent Expenditures Cannot Be Upheld**

The FEC cannot meet its burden here for the primary reason that independent expenditures made from a separate account do not present any threat of corruption or its appearance that would justify limiting the contributions National Defense PAC solicits and accepts for independent expenditures. *EMILY's List,* 581 F.3d at 7 (Supreme Court "has consistently dismissed the notion that expenditures implicate the anti-corruption interest."). National Defense PAC has stated it will establish a separate account to make its independent expenditures and will ensure that the costs of administering the funds from which it makes candidate contributions are paid from that candidate contribution account. VC at ¶¶ 1, 13, 15, 49.

National Defense PAC is a non-connected committee. *Id.* at ¶¶ 2, 10. It claims a major purpose of campaign activity. *Id.* Yet, its major purpose cannot be the basis for prohibiting it from establishing a separate account to make independent expenditures from unlimited funds. In *SpeechNow.org v. FEC,* the organization claimed a major purpose of campaign activity and the *SpeechNow.org* opinion permits it to make independent expenditures from unlimited funds. *SpeechNow.org v. FEC,* 599 F.3d 686 (D.C. Cir. 2010). The FEC's reasoning then—to the extent a split decision admits of reasoning—must be based upon a need to combat some potential corruption. That potential for corruption would have to be based upon National Defense PAC's connection

to candidates in some way.  *See Buckley v. Valeo,* 424 U.S. 1 (1976).  The lack of any corruption here is illustrated by reviewing the rights of other political organizations.

Organizations that are comprised of or controlled by candidates can pose a threat of corruption, as in the case of national party committees.  *See McConnell v. FEC,* 540 U.S. 93 (2003).  It is worth noting that, despite the unique form of corruption posed by the party committee, the *McConnell* Court did not uphold a provision of the Bipartisan Campaign Reform Act of 2002, Pub. Law., 107-155 (March 27, 2002), that required parties to choose between making independent expenditures on behalf of candidates and making in-kind contributions to candidates.  *See McConnell v. FEC,* 540 U.S. 93, 213-18 (2003).

But National Defense PAC is not a party committee, and the *EMILY's List* opinion makes plain that non-profits do not pose the threat of corruption posed by party committees.  *See EMILY's List v. FEC,* 581 F.3d 1, 13 (2009) ("*[M]cConnell* does not support such regulation of non-profits").  In that sense, because National Defense PAC is not a party committee, any bootstrapping of *McConnell's* reasoning here would be invalid.

Even after the landmark opinion in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), it remains a crime for corporations and labor unions to make contributions to candidates from treasury funds.  *See* 2 U.S.C. 441b.  At the same time, corporations and labor unions are permitted by statute to use treasury funds (soft money) to pay the expenses of administering a separate segregated fund ("SSF") used to make contributions to candidates from hard money.  2 U.S.C. § 441b.  It is the prophylactic effect of separate accounts that allows the SSF to make contributions to

candidates with hard money while paying the SSF's administrative expenses with soft money. Similarly, the prophylactic required of non-connected political committees like National Defense PAC should be tied to the anti-corruption interest without curtailing independent speech. This is achieved with separate accounts: funds contributed to National Defense PAC for independent expenditures should not fund contributions to candidates.

Corporations and labor unions may make unlimited independent expenditures from treasury funds while using SSFs to make contributions to candidates. *Citizens United,* 130 S. Ct. 876 (2010). Indeed, the Citizens United organization operated an SSF for a decade and made candidate contributions. This did not prevent the Court from overruling *Austin v. Michigan Chamber of Commerce* on its behalf and recognizing its right to make unrestricted independent expenditures. *Citizens United,* 130 S. Ct. at 913. Justice Stevens noted the fact of Citizens United's PAC in his dissenting opinion.

> In the case at hand, all Citizens United needed to do to broadcast *Hillary* right before the primary was to abjure business contributions or use the funds in its PAC, which by its own account is "one of the most active conservative PACs in America," Citizens United Political Victory Fund, http://www.cupvf.org/. [40]
>
> ***
>
> 40. Citizens United has administered this PAC for over a decade. [citation omitted]. Citizens United also operates multiple "527" organizations that engage in partisan political activity. *See* Defendant FEC's Statement of Material Facts as to Which There Is No Genuine Dispute in No. 07-2240 (DC), PP 22-24.

*Citizens United,* 130 S. Ct . 876, 944 n.40 (2010), (Stevens, J., dissenting).

The Supreme Court recognized Citizens United's right to make independent expenditures with unrestricted funds while fully aware that the organization maintained a

separate segregated fund for making contributions to candidates. *Id.* A non-connected political committee also must be permitted to make independent expenditures with unlimited funds. Maintaining separate accounts cures any potential corruption of candidates.

The FEC may rely upon two more arguments to deny National Defense PAC and all other non-connected committees save EMILY's List, *see EMILY's List,* 581 F.3d at 12, their right to make independent expenditures with unlimited funds. It may argue that the *Citizens United* opinion is not instructive because the Citizens United organization and the Citizens United Voter Fund are separate legal entities. It may also attempt to rely on the *California Medical Association* opinion to conclude that non-connected committees cannot make independent expenditures with unlimited funds because doing so will corrupt candidates. Both arguments fail.

       **1.**     ***CalMed* Does Not Support The Conclusion That A Non-Connected Committee's Independent Expenditures Corrupt Candidates**

While the Supreme Court has never directly addressed whether the government has a compelling interest in limiting contributions to a non-connected committee making independent expenditures, its decision in *California Medical Association v. FEC,* 453 U.S. 182 (1981) [hereinafter *CalMed*], provides guidance on the proper analysis of the issue in this case. *CalMed* involved a challenge by a multi-candidate committee—defined as a political committee that makes contributions to five or more federal candidates—to the $5000 annual contribution limit under 2 U.S.C. § 441a(a)(1)(C). *Id.* at 194. Concluding that contributions to the multi-candidate committee amounted merely to "speech by proxy" of the PAC's contributors—which was entitled to lesser protections

16

under the First Amendment—a plurality of the Court upheld the limit on the ground that it served the government's interest in preventing circumvention of the limits on contributions made directly to candidates.  *Id.* at 196-98.  The multi-candidate committee made contributions directly to candidates.  Thus, according to the plurality, contributors seeking to avoid the (at the time) $1000 annual candidate contribution limits could make larger contributions to multi-candidate committees, which could then be funneled to candidates.  *Id.* at 197-98.

Justice Blackmun separately concurred and concluded that the plurality's anti-circumvention rationale applied only because the committee at issue was a multi-candidate committee that made direct contributions to candidates.  *Id.* at 203.  Justice Blackmun rejected the plurality's conclusion that contributions to the multi-candidate committee were not entitled to full First Amendment protection, i*d.* at 201-02, and concurred in the plurality's judgment, however, because he recognized that, as applied to multi-candidate committees, the annual contribution limit was a narrow means of preventing circumvention of the limits that applied to direct contributions to candidates. *Id.* at 203.

Justice Blackmun made clear that the same analysis would not apply to limits on contributions to committees "established for the purpose of making independent expenditures."  *Id.*  In sharp contrast to multi-candidate committees—which are "conduits for contributions to candidates" and thus raise concerns about corruption—"contributions to a committee that makes only independent expenditures pose no such threat."  *Id.*  As Justice Blackmun explained,

> [t]he Court repeatedly has recognized that effective advocacy of both
> public and private points of view, particularly controversial ones, is

> undeniably enhanced by group association…. By pooling their resources, adherents of an association amplify their voices…; the association is but the medium through which its individual members seek to make more effective the expression of their own views.

*Id.* (internal quotation marks and citations omitted). Because Justice Blackmun's decision is the narrower one, his is the controlling decision in the case. *See Marks v. United States,* 430 U.S. 188, 193 (1977) (stating that when the Court issues a fragmented decision, the position of the narrowest concurrence controls).

Two principles emerge from *CalMed.* First and foremost, under Justice Blackmun's controlling opinion, the government may limit contributions to groups only where they implicate the interest in preventing corruption or its appearance. 453 U.S. at 203. While contributions to multi-candidate committees that in turn fund contributions to candidates can raise such concerns, contributions for independent expenditures cannot. *Id.* at 203-04; *see also Citizens United v. FEC,* 130 S. Ct 876, 909 (2010) (independent expenditures do not create the appearance of, or actual, quid pro quo corruption).

Second, even the plurality's conclusions apply only to multi-candidate committees that make contributions directly to candidates. *See EMILY's List,* 581 F.3d 1, 9 n.8 (discussing *CalMed)*; 12 n.10 ("The *CalMed* Court never stated that non-profits could be required to use hard money for advertisements."). This point is not only implicit in the plurality's analysis; it is also stated expressly in the opinion. In a footnote, the plurality noted that the ACLU in an *amicus* brief claimed that the contribution limit at issue "would violate the First Amendment if construed to limit the amount individuals could jointly expend to express their political views." *Id.* at 197 n.17. This concern was not at issue in the case, however, because it involved only a multi-candidate committee that made contributions directly to candidates. *Id.* As the plurality explained,

"[c]ontributions to such committees are therefore distinguishable from expenditures made jointly by groups of individuals in order to express common political views." *Id.*  *See also Cal. Med. Ass'n. v. FEC,* 641 F.2d 619, 625 (9th Cir. 1980) (Kennedy, J.) (multi-candidate committee is "natural conduit for candidate contributions… and the essential purpose of the provision here in question is to limit those contributions, *not* to limit expenditures for any other type of political advocacy) (emphasis added).  In short, the National Defense PAC's case is distinguishable from the fact pattern in *CalMed*— National Defense PAC asks to make independent expenditures, the California Medical Association did not—and falls squarely within the reason of Justice Blackmun's controlling concurrence.

> **2.    A Connected Organization And Its SSF May Be Separate Legal Entities, But That Does Not Mean Separate Accounts Do Not Stem Corruption In Non-connected Committees.**

The FEC may attempt to distinguish the rights of non-connected committees from the rights of connected committees.  It may point out that a corporation or labor union (the "connected organization") and its separate segregated fund are legally separate entities. *See CalMed,* 453 U.S. at _; *Citizens United,* 130 S. Ct. at _.  It is this separation, the FEC might argue, that permits a non-profit like California Medical Association to accept unlimited contributions for independent expenditures but prevents a non-connected committee that makes candidate contributions, like CALPAC, from doing the same.  The FEC may argue that the *Citizens United* opinion really means the Citizens United organization is permitted to use unrestricted funds for its independent expenditures, but the Citizens United Political Voter Fund, a separate legal entity, may not.  Any argument of this kind would have to be based on the belief that separating the accounts for soft-money independent expenditures and hard-money candidate

contributions is an insufficient prophylactic against any potential corruption to candidates.

But this argument is undermined and invalidated by the FEC's longstanding policy of recognizing the right of non-connected committees to maintain one hard-money account to make contributions to federal candidates while maintaining a soft money account to make non-federal disbursements and donations. *See* 11 CFR 102.5. For years, the FEC's regulations have required each organization "that finances political activity in connection with *both* Federal and non-Federal elections and that qualifies as a political committee under 11 CFR 100.5," which includes non-connected committees, to either pay for all non-federal activity with federal dollars or establish two accounts: one federal, the other non-federal (or soft money). 11 CFR 102.5

The federal account "shall be treated as a separate Federal political committee that must comply with the requirements of the Act including the registration and reporting requirements of 11 CFR parts 102 and 104. Only funds subject to the prohibitions and limitations of the Act [a.k.a. "hard money" or "Federal funds"] shall be deposited in such separate Federal account." *Id.* What safeguard ensures that federal candidates are not corrupted by non-federal funds housed inside the non-connected committee? The same requirement that the National Defense PAC would follow in financing its proposed independent expenditures with unrestricted funds: the restrictions of 11 CFR 102.5. "No transfers may be made to such Federal account from any other account(s) maintained by such organization for the purpose of financing activity in connection with non-Federal elections." *Id.*

If separate accounts are the trusted method of ensuring that a non-connected committee's non-federal funds for non-federal activity do not corrupt federal candidates, then separate accounts must serve the same anti-corruption interests here. That is, separate accounts and a prohibition on transfers between accounts—transfers from the non-federal account to the federal account—will ensure that non-federal funds for independent expenditures will not corrupt federal candidates. And separate accounts have the virtue of being a narrowly drawn remedy to further any interest in protecting against quid pro quo corruption while recognizing Plaintiffs' rights to speak effectively. After all, that is exactly what the *EMILY's List* court decided as a matter of binding precedent nearly fifteen months ago.

> **B.**     **As a Matter of *Stare Decisis,* National Defense PAC's Rights Have Already Been Upheld**

Finally, this question has already been squarely decided by the D.C. Circuit Court of Appeals in *EMILY's List v. FEC,* 581 F.3d 1 (2009).

> What about a non-profit entity that falls into both categories -- in other words, a non-profit that makes expenditures *and* makes contributions to candidates or parties? EMILY's List is a good example of such a hybrid non-profit: It makes expenditures for advertisements, get-out-the-vote efforts, and voter registration drives; it also makes direct contributions to candidates and parties.
>
> ***
>
> The constitutional principles that govern such a hybrid non-profit entity follow ineluctably from the well-established principles governing the other two categories of non-profits. To prevent circumvention of contribution limits by individual donors, non-profit entities may be required to make their own contributions to federal candidates and parties out of a hard-money account -- that is, an account subject to source and amount limitations ($ 5000 annually per contributor). Similarly, non-profits also may be compelled to use their hard-money accounts to pay an appropriately tailored share of administrative expenses associated with their contributions. *See Cal. Med, 453 U.S. at 198-99 n.19* (opinion of Marshall, J.). But non-profit entities are entitled to make their

21

> expenditures -- such as advertisements, get-out-the-vote efforts, and voter
> registration drives -- out of a soft-money or general treasury account that
> is not subject to source and amount limits. Stated another way: A non-
> profit that makes expenditures to support federal candidates does not
> suddenly forfeit its *First Amendment* rights when it decides also to make
> direct contributions to parties or candidates. Rather, it simply must ensure,
> to avoid circumvention of individual contribution limits by its donors, that
> its contributions to parties or candidates come from a hard-money account.

*EMILY's List,* 581 F.3d at 12.

The *EMILY's List* opinion is no outlier.  It is firmly grounded in the Supreme Court's campaign finance jurisprudence.  The Supreme Court has held that independent expenditures, whether by individuals, committees, corporations or labor unions, cannot constitutionally be limited, because they are, by definition, unconnected to candidates and thus cannot raise any concerns about corruption.  *See Citizens United v. FEC,* 130 S. Ct. 876 (2010); *FEC v. Nat'l Conservative Political Action Committee,* 470 U.S. 480, 496-97 (1985) [hereinafter *NCPAC*]; *Buckley v. Valeo,* 424 U.S. 1 (1976).  The Court has also held that limits on contributions to groups that make independent expenditures are necessarily restrictions on their expenditures.  *See Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299-300 (1981); *EMILY's List v. FEC,* 581 F.3d 1 (D.C. Cir. 2009).  Combined, these principles make clear that the contribution limits that apply to the funding of candidate contributions cannot constitutionally be applied to the independent expenditures of National Defense PAC.

   C.   **The FEC Cannot Demonstrate a Compelling, Substantial or Legitimate Interest in Limiting Contributions to National Defense PAC.**

As the Supreme Court has repeatedly stated, a fundamental purpose of the First Amendment was to protect the discussion of governmental affairs, and, in particular, of

candidates, in order to "ensure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley,* 424 U.S. at 14.  Thus, the First Amendment protects vigorous advocacy intended to influence the outcome of elections no less than the discussion of ideas.  *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 790 (1978).  It also protects the right of individuals to associate with one another because "effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama,* 357 U.S. 449, 460 (1958).  By associating with others, "individuals can make their views known, when, individually, their voices would be faint or lost." *Citizens Against Rent Control,* 454 U.S. at 294.  *See also Buckley,* 424 U.S. at 22 (stating that the purpose of the right of association is to allow individuals to amplify their voices by associating with others).  All this rests at the very heart of what National Defense PAC hopes to accomplish.

The Supreme Court has held that "[i]ndependent expenditures constitute expression 'at the core of our electoral process and of the First Amendment freedoms.'" *MCFL,* 479 U.S. at 254 (quoting *Buckley,* 424 U.S. at 39).  *See also, NCPAC,* 470 U.S. at 493 (stating that independent expenditures "produce speech at the core of the First Amendment").  As a result, limits on what committees can spend independently of candidates and party committees are subject to the highest constitutional protection. As the Court stated in *NCPAC,* "[a] restriction on the amount of money a person or group can spend on political communications during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.  This is because virtually every means

of communicating ideas in today's mass society requires the expenditure of money." *Id.* at 493-94 (quoting *Buckley,* 424 U.S. at 19).

While the limit at issue in *NCPAC* operated directly on expenditures by the group, rather than contributions to it, limits on contributions for independent expenditures automatically operate to limit the group's expenditures. *See also EMILY's List,* 581 F.3d at 14, n.13 ("Limits on donations to non-profit entities are analytically akin to limits on expenditures by the donors."). The conclusion necessarily follows from the Supreme Court's decision in *Citizens Against Rent Control.* That case involved a $250 limit on contributions to support or oppose a ballot measure. 454 U.S. at 292. Concluding that the limit prevented individuals from pooling their funds in order to finance their collective advocacy, the Court applied exacting scrutiny and struck it down. *See id.* at 294-95, 300. In arriving at that conclusion, the Court recognized that the limit on contributions necessarily limited the funds that the group could spend on its own speech. *See id.* at 299. As the Court explained, while an individual may make unlimited expenditures under the law, she may not "contribute beyond the $250 limit when joining with others to advocate common views. The contribution limit thus automatically affects expenditures, and limits on expenditures operate as a direct restraint on freedom of expression…." *Id. See also id.* ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression.").

The same is true here. To produce and distribute just the initial ads for which National Defense PAC now has scripts will cost upwards of $6300.00. *See* VC at ¶ 24, EXHIBIT F. Without the contributions from Plaintiff Kelly Eustis, the National Defense PAC would be unable to produce and distribute these ads. VC at ¶¶ 25-26, EXHIBIT G.

Even assuming that National Defense PAC could raise sufficient funds in increments of less than $5000 to pay for these ads, the contribution limits would still significantly limit the number of times it could run those ads, and would limit its ability to run additional ads concerning other federal candidates in other races. *Id.* at ¶ 35. In short, it is undeniable that the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) directly restrain National Defense PAC's expenditures and reduce the quantity of its expression by restricting the number of political candidates it can discuss, the number of times it can distribute its ads, and the size of the audience it can reach.

Thus, as in *NCPAC*, *Citizens Against Rent Control,* and *EMILY's List,* the contribution limits that apply to National Defense PAC restrict plaintiffs' rights to pool their funds in order to amplify their voices beyond what any of them would be able to achieve on their own. *See NCPAC,* 470 U.S. at 495; *Citizens Against Rent Control,* 454 U.S. at 296; *EMILY's List,* 581 F.3d at 12. The contribution limits thus restrict the rights to free speech and association of both National Defense PAC and its supporters. *See Citizens Against Rent Control,* 454 U.S. at 299-300 (stating that the rights of speech and association "blend and overlap" and are both implicated by contribution limits imposed on groups that support or oppose ballot issues). In other words, the contribution limits restrict not only National Defense PAC's right to free speech by limiting the funds it has available to spend on its advertisements. The limits also directly restrict its supporters' rights to free speech by preventing them from pooling their funds and speaking collectively through National Defense PAC. *See NCPAC,* 470 U.S. at 495.

As applied to National Defense PAC's independent expenditures, the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) operate very differently

from the contribution limits in the circumstances in which the Supreme Court upheld them in *Buckley.*  There, the Court addressed limits that applied to contributions made directly to candidates or their committees.  424 U.S. at 23-38.  Finding that contributions to candidates served as only a "general expression of support for the candidate and his views but does not communicate the underlying basis for the support" and that the contributors' expression "rests solely on the undifferentiated symbolic act of giving," the Court concluded that the speech element in contributions to candidates was minimal.  *See id.* at 21.  By contrast, National Defense PAC will use plaintiffs' contribution to make independent expenditures—direct funding of speech, not contributions to candidates.

Support for National Defense PAC's independent expenditures thus conveys much more than the "undifferentiated, symbolic act of giving."  *Buckley,* 424 U.S. at 21.  It conveys agreement with National Defense PAC's message.  As the Court stated in rejecting the "speech by proxy" argument in *NCPAC,* "the contributors obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise, they would not part with their money."  470 U.S. at 95.

The Supreme Court, barely one year ago in *Citizens United*, again identified the sole interest sufficiently compelling to limit contributions to political organizations: that of preventing the actual or apparent quid pro quo corruption of candidates.  130 S. Ct. at 908-909.  As the Court has stated, "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *NCPAC,* 470 U.S. at 496-97.  *See also Randall v. Sorrell,* 548 U.S. 230, 246-248 (2006) (recognizing corruption as the only interest that can support contribution limits and striking down limits as broader than necessary to achieve

that interest); *Citizens Against Rent Control,* 434 U.S. at 437-38 ("*Buckley* identified only a single narrow exception to the rule that limits on political activity were contrary to the First Amendment.  The exception relates to the perception of undue influence of large contributors to a *candidate.*") (emphasis in original).

> **D.**      **As Applied to National Defense PAC and its Supporters, the Contribution Limits Are Not Narrowly Tailored**

"Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation."  *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 265 (1986) ("*MCFL*").  The "problem" for which Congress passed FECA's contribution limits was the appearance of or actual corruption of candidates.  *See Buckley,* 424 U.S. at 23-38.  Thus, regulating "only to the degree necessary" to address that problem would mean applying contribution limits only to those groups that raise concerns about corruption.  Here, the FEC wields far too blunt an instrument to cure any form of recognized quid pro quo corruption.  As demonstrated above, National Defense PAC's independent expenditure account cannot raise such concerns and cannot be used to circumvent the limits on contributions to candidates.  As a result, applying contribution limits to National Defense PAC and its supporters is not narrowly tailored.  *See, e.g., NCPAC,* 470 U.S. at 498; *CalMed,* 453 U.S. at 203-04 (Blackmun, J. concurring).

It is no answer to say that National Defense PAC could speak adequately with less money.  As the Supreme Court made clear in *WRTL,* cheaper alternatives are not reasonable alternatives in terms of "impact and effectiveness."  551 U.S. 449, 477 n.9.

Even under "less rigorous review," limits are permissible only if the are "closely drawn" to serve a "sufficiently important governmental interest." *Randall,* 548 U.S. at 247 (quoting *Buckley,* 424 U.S. at 25).  This is not a cursory review, and, to date, the Supreme Court has identified only the interest in combating corruption of candidates as important enough to justify contribution limits.  *See, e.g., NCPAC,* 470 U.S. at 496-97; *Buckley,* 424 U.S. at 25, 28.  As discussed above, National Defense PAC's independent expenditure account cannot raise any concerns about corruption or its appearance and cannot be used to circumvent the limits on contributions to candidates.  Thus, even if this court concludes that strict scrutiny does not apply here, Plaintiffs have still demonstrated a substantial likelihood of success on the merits to justify a preliminary injunction.  *See, e.g., N.C. Right to Life, Inc. v. Leake,* 482 F. Supp. 2d 686, 698-99 (W.D. N.C. 2007) (holding contribution limit unconstitutional as applied to independent expenditure committee even under the lesser scrutiny that applies to limits on contributions to candidates).

National Defense PAC's independent expenditures pose no threat of corruption. Its willingness to maintain a separate account for its candidate contributions and willingness to administer that account with hard money ensures that it will pose no threat of corruption to candidates.  The government's interest is furthered by the narrowly tailored requirement that National Defense PAC not make transfers between accounts. The FEC's failure to respond to National Defense PAC's request, to recognize the relation between the government's interest and the remedy of separate accounts, and its failure to provide Plaintiffs with a defense to prosecution, place Plaintiffs in harm that can only be cured with an injunction.

28

## II.      Plaintiffs Will Suffer Irreparable Harm Without an Injunction

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Under the contribution limits of 2 U.S.C. § 441a(a)(1)(C), National Defense PAC cannot distribute the ads for which it currently has scripts.  Plaintiff Eustis is ready, willing, and able to contribute the necessary funds, and National Defense PAC will distribute those ads if it is legally permitted to accept those funds.  VC at ¶¶ 24-25.  The only thing standing between National Defense PAC and its ability to speak through its ads are the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).   Thus, Plaintiffs' rights are in fact being impaired right now; there is nothing speculative about their claims.  *See Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 301 (D.C. Cir. 2006) (stating that "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed").

While Plaintiffs are irreparably harmed right now, that harm is ongoing and increases as time passes.  Any money that National Defense PAC cannot collect now deletes the amount of speech it can plan on making in the 2012 primary elections.  VC, ¶¶ 24-29.

## III.      An Injunction Will Not Substantially Injure Others

In a recent campaign finance decision, the Supreme Court made clear that in any conflict between First Amendment rights and regulation, courts "must give the benefit of any doubt to protecting rather stifling speech," and that "the tie goes to the speaker, not the censor." *WRTL,* 551 U.S. at 469, 474.  Thus, while the FEC can be said to have an interest in enforcing the campaign finance laws, under the Supreme Court's approach to

First Amendment rights in *WRTL,* the FEC's interest simply cannot trump the First Amendment rights of Plaintiffs.  An injunction will not harm the FEC.

## IV.     An Injunction Will Further the Public Interest

The Supreme Court "has long viewed the First Amendment as protecting a marketplace for the clash of different views and conflicting ideas.  That concept has been stated and restated almost since the Constitution was drafted."  *Citizens Against Rent Control,* 454 U.S. at 295.  Plaintiffs wish to participate in the marketplace of ideas by attempting to convince citizens to support candidates who have demonstrated a commitment to the Nation through their military service and who support the principle of limited, constitutional government.

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs … includ[ing] discussion of candidates."  *Mills v. Alabama,* 384 U.S. 214, 218 (1966).  Thus "speech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana,* 379 U.S. 64, 74-75 (1964).  Plaintiffs wish to participate in the process of self-government by urging voters to support candidates who are veterans and who support limited constitutional government and oppose those who do not.

The First Amendment reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *N.Y. Times v. Sullivan,* 376 U.S. 254, 270 (1964).  In short, Plaintiffs' activities are at the core of the First Amendment.  National Defense PAC, and all other non-connected committees, must be permitted to make independent expenditures out of unlimited

30

corporate, union or individual funds, even though it maintains a separate bank account that contributes to candidates from amount and source restricted funds. *Citizens United v. FEC,* 130 S. Ct. 876, 909 (2010) ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption."). Unlike unions and corporations, however, who enjoy a statutory dispensation, the FEC can require the National Defense PAC to pay a portion of administrative expenses from a hard money account. This will accord the Court's decision in *CalMed.* 453 U.S. at 198-99 n.19 (opinion of Marshall, J.). And such recognition by this court will remedy the injury to plaintiffs' First Amendment interests.

## V.    Plaintiffs Have Standing to Seek the Injunction

To establish standing, plaintiffs must demonstrate three elements: an injury in fact, a causal connection between the injury and the defendant's conduct, and a likelihood that the injury will be redressed by a decision favorable to the plaintiff. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is satisfied when plaintiffs make a showing of an "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. (internal quotation marks and citations omitted). Plaintiffs have established an injury in fact capable of relief issued by this court. Moreover, there exists a causal connection between the FEC's failure to issue an affirmative advisory opinion and the Plaintiffs' injuries, and a decision issued by this court will redress those injuries.

Within the context of the First Amendment, the Supreme Court has announced relaxed standing requirements for pre-enforcement challenges. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479 (1965) (detailing expanded standing principles for pre-enforcement

First Amendment challenges); *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (self-censorship is a harm that can be alleged without actual prosecution); *Chamber of Commerce v. FEC*, 69 F.3d 600, 603-04 ("A party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution").  Would-be speakers bringing pre-enforcement challenges must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," and illustrate that there exists a "credible threat of prosecution" under the law in question. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  In this special arena, where a statute on its face "restricts a party from engaging in expressive activity, there is a presumption of a credible threat of prosecution." *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001).

Here, National Defense PAC has alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed" by law. *Babbitt*, 442 U.S. at 298.  Specifically, National Defense PAC prepared independent expenditure advertisements for the upcoming 2012 electoral cycle, but cannot accept contributions to fund them due to the reach of 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3). *See* VC, ¶¶ 24-26 & Exhibits F & G.  National Defense PAC would like to fundraise and accept contributions for additional independent expenditure campaigns in the 2012 electoral cycle, but its actions are prohibited just the same. *See* VC, ¶¶ 25-26.  Kelly S. Eustis would like to make a donation of $6,300.00 to National Defense PAC, but cannot due to the operation of the law. *See* VC, ¶¶ 26-27.

National Defense PAC suffers injuries against its First Amendment protected interests that are imminent as well – the organization must be able to plan for its communications and operations, as well as fundraise to support them.  *See* VC, ¶ 26.  By operation of the law, National Defense PAC must hinder its speech and association until a definitive ruling is issued by this court protecting National Defense PAC's constitutional rights and that of its donors.  Because federal elections occur every two years, its injuries are ongoing.  *See Virginia Soc'y*, 263 F.3d at 389 (First Amendment injury is ongoing where it relates to proscribed speech concerning federal elections).

National Defense PAC has established concrete plans to engage in constitutionally protected conduct that is subject to the reach of the challenged laws.  Its speech and association are chilled due to fear of prosecution by the Federal Election Commission.  Most recently, the Commission failed to provide an advisory opinion in response to Plaintiffs' request that their planned activities would be permissible under the FECA.  The FEC's refusal to issue an advisory opinion deprives National Defense PAC of a legal reliance defense which it could otherwise receive under 2 U.S.C. § 437f(c). *See FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 185 (D.C. Cir. 2001) (noting that "advisory opinions have binding legal effect on the Commission").  Because of this, and as recognized by the D.C. Circuit Court of Appeals in *Unity '08 v. FEC*, this failure to issue an advisory opinion "denies a right with consequences sufficient to warrant review."  596 F.3d 861, 865 (D.C. Cir. 2010) (internal quotations omitted).  National Defense PAC's only other course of action is to risk enforcement penalties—a jeopardy never permitted by the First Amendment.

**VI.     The Court Should Waive the Bond Requirement Under F.R.C.P. 65(c).**

Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction shall issue without the giving of security by the applicant in an amount determined by the court. However, "[i]t is within the Court's discretion to waive Rule 65(c)'s security requirement where it finds such a waiver to be appropriate in the circumstances." *Cobell v. Norton,* 225 F.R.D. 41, 50 n.4 (D.D.C. 2004). In non-commercial cases, courts often waive the bond requirement where the likelihood of harm to the non-moving party is slight and the bond requirements would impose a significant burden on the moving party. *See, e.g., Temple Univ. v. White,* 941 F.2d 201, 219 (3d Cir. 1991); *Comm. on Jobs Candidate Advocacy Fund v. Herrera,* 2007 U.S. Dist. LEXIS 73736, at *17-*18. Cases raising constitutional issues are particularly appropriate for a waiver of the bond requirement. *See Odgen v. Marendt,* 264 F. Supp. 2d 785, 795 (S.D. Ind. 2003); *Smith v. Bd. of Election Comm'rs,* 591 F. Supp. 70, 71 (N.D. Ill. 1984). Accordingly, Plaintiffs respectfully request that the court waive the bond requirement in the event that it grants Plaintiffs' motion for preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for preliminary injunction and enjoin the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) and applicable regulatory requirements as they apply to Plaintiffs. The Court should also waive the bond requirement under the Federal Rules of Civil Procedure 65(c).

Dated: January 28, 2011

Respectfully submitted,

34

Dan Backer (D.C. Bar No. 996641)
P.O. Box 75021
Washington, DC 20013
202.210.5431
dbacker@dbcapitolstrategies.com

Stephen M. Hoersting*
700 E Schantz Ave
Dayton, OH 45419
937.623.6102
hoersting@gmail.com

Benjamin T. Barr*
10737 Hunting Lane
Rockville, MD 20850
240.863.8280
benjamin.barr@gmail.com

　　　*Motions for *Pro Hac Vice* to be filed.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
Rear Adm. James J Carey [Ret]           )
6022 Knights Ridge Way                  )
Alexandria, VA 22310                    )
                                        )
Kelly S. Eustis                         )
1431 Q Street                           )
Apt. 130                                )
Sacramento, California 95811            )
                                        )
National Defense Political              )
Action Committee                        )
6022 Knights Ridge Way                  )
Alexandria, VA 22310                    )
                                        )
            Plaintiffs,                  )
                                        )
      v.                                )      Civil Case No. _____
                                        )
FEDERAL ELECTION COMMISSION             )
999 E Street, NW                        )
Washington, DC 20463,                   )
                                        )
            Defendant.                   )
_____)

_____

NOTICE OF CONSULTATION ON MOTIONS WITH OPPOSING COUNSEL
_____

    In accord with Local Rule of Civil Procedure 7(m), Plaintiffs have conferred by telephone with legal counsel for the Federal Election Commission regarding the following non-dispositive motions.  This notice provides and consolidates opposing counsel's positions on all motions filed contemporaneously with the Verified Complaint.

1. Motion for Benjamin T. Barr to be admitted *pro hac vice*. Date of telephone conference: January 27, 2011. Opposing counsel's position: Consent.

2. Motion for Stephen M. Hoersting to be admitted *pro hac vice*. Date of telephone conference: January 27, 2011. Opposing counsel's position: Consent.

3. Motion for Preliminary Injunction. Date of telephone conference: January 27, 2011. Opposing counsel's position: Oppose.

Respectfully submitted,

Dan Backer (DC Bar No. 996641)
PO Box 75021
Washington, DC 20013
202.210.5431
dbacker@dbcapitolstrategies.com

Stephen M. Hoersting*
700 E Schantz Ave
Dayton, OH 45419
937.623.6102
hoersting@gmail.com

Benjamin T. Barr*
10737 Hunting Lane
Rockville, MD 20850
240.863.8280
benjamin.barr@gmail.com

*Attorneys for Plaintiffs*

*Motions for *Pro Hac Vice* to be filed.