# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                        |   |                              |
|----------------------------------------|---|------------------------------|
| **REAR ADM. (RET) JAMES J. CAREY** *et al.*, | ) |                              |
|                                        | ) |                              |
| **Plaintiffs,**                        | ) |                              |
|                                        | ) |                              |
| **v.**                                 | ) | **Civil Action No. 11-259 (RMC)** |
|                                        | ) |                              |
| **FEDERAL ELECTION COMMISSION,**       | ) |                              |
|                                        | ) |                              |
| **Defendant.**                         | ) |                              |

## MEMORANDUM OPINION ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Rear Adm. (Ret.) James J. Carey and the National Defense Political Action Committee ("NDPAC") seek to solicit and expend contributions for: (1) independent expenditures in federal election campaigns; and (2) direct funding of federal candidates, a candidate's political committee, or political party committees. They seek to solicit *unlimited* funds for use in independent expenditure campaigns, while maintaining statutory limits on solicitation of funds for direct funding of federal candidates. Plaintiffs propose to keep these two distinct pools of funds segregated by maintaining separate banking accounts. Plaintiff Kelly S. Eustis is a private citizen who would like to contribute toward NDPAC's independent expenditure campaigns in an amount currently exceeding the statutory maximum of $5,000.

Plaintiffs seek a preliminary injunction to enjoin the Federal Election Commission ("FEC" or "Commission") from enforcing 2 U.S.C. §§ 441a(a)(1)(C) & 441a(a)(3) against NDPAC for its planned solicitation and acceptance of *unlimited* contributions (including Plaintiff Eustis') for use in making independent expenditures in federal election campaigning; Plaintiffs do not challenge

the Commission's power to enforce the amount and source limits with respect to solicitation and use of contributions directly for federal candidates and party committees. The Commission opposes the motion, failing to appreciate the applicability of *Citizens United v. FEC*, 130 S. Ct. 876 (2010), *EMILY's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009), and *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010), which govern the result in this case. A limited preliminary injunction will be granted.

## I. FEDERAL ELECTION CAMPAIGN LAW

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431 *et seq*., *inter alia*, imposes limits on the sources and amounts of contributions that may be made by individuals and groups to federal candidates, party committees, and political action committees. Key to assessing these limits is the identity of the receiver of those contributions and the purpose for which those contributions are expended.

Under FECA, a contribution is "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 2 U.S.C. § 431(8). A contribution, however, can be used in several ways, and depending on that purpose it can legally be limited to certain amounts.

If contributions are directed toward a federal candidate's personal coffers or his or her own political action committee, such contributions are subject to statutory limits because of the "strong governmental interest in combating corruption and the appearance thereof." *EMILY's List*, 581 F.3d at 8. The same can be said of contributions to political party committees because of the "close relationship between candidates and parties." *Id*. at 9. Section 441a(a)(1)(C) provides that

no person shall make contributions "to any other political committee . . . in any calendar year which, in the aggregate, exceed $5,000." 2 U.S.C. § 441a(a)(1)(C). Section 441a(a)(3) provides:

> During the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than –
>     (A) $37,500, in the case of contributions to candidates and the authorized committees of candidates;
>     (B) $57.500, in the case of any other contributions, of which not more than $37,500 may be attributable to political committees which are not political committees of national political parties.

2 U.S.C. § 441a(a)(3). All contributions and expenditures made subject to these source and amount limitations are referred to as "hard money." *See EMILY's List*, 581 F.3d at 27.

Under §§ 441a(a)(1)(C) & 441a(a)(3) there is no distinction made between political committees directly associated with parties/federal candidates and non-connected political action committees.[1] And no distinction need be made if the non-connected political action committee is merely funneling its contributions, as a "conduit," to federal candidates, their personal political action committees or political party committees. *See EMILY's List*, 581 F.3d at 24–26. Generally speaking, "[u]nder FECA, a political committee is 'any committee, club, association, or other group of persons' that receives contributions of more than $1000 in a year or makes expenditures of more than $1000 in a year." *SpeechNow.org v. FEC*, 599 F.3d at 691 (citing 2 U.S.C. § 431(4)). "Once a group is so designated, contributions to the committee are restricted by 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3)." *Id*.

If, however, a non-connected political action committee is making independent

---

[1] "'Non-connected' means that the [political action committee] is not a candidate committee, a party committee, or a committee established by a corporation or labor union." *EMILY's List*, 581 F.3d at 15 n.7.

expenditures,[2] wholly separate from federal candidates or parties, the analysis is different because there is not that same governmental interest in protecting *quid pro quo* corruption. *See EMILY's List*, 581 F.3d at 9–11. Recent Supreme Court and D.C. Circuit cases have partially invalidated statutory provisions within FECA with respect to the limits placed on contributions for independent expenditures in federal election campaigns. *See Citizens United v. FEC*, 130 S.Ct. 876 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010); *EMILY's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009).

These cases have clarified the constitutional scope of monetary limits on contributions for the purpose of independent expenditures. Contributions and expenditures are *not* limited for this purpose and may be made from a "general treasury account that is not subject to source and amount limits," otherwise known as "soft money." *See EMILY's List*, 581 F.3d at 27. These cases have found that limits on soft money contributions used for independent expenditures are unconstitutional because such a limitation violates a contributor's First Amendment rights, while also finding that hard money limits on expenditures that directly support federal candidates, their authorized committees, or any political committee established and maintained by a national political party are constitutional. *See generally Citizens United v. FEC*, 130 S.Ct. 876 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010); *EMILY's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009).

---

[2] Independent expenditures are "expenditure[s] by a person--(A) expressly advocating the election or defeat of a clearly identified candidate; and (B) that [are] not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 2 U.S.C. § 431(17).

## II. FACTS

Admiral Carey is the founder and treasurer of NDPAC, a political action committee registered with the Commission.  Verified Compl. ¶¶ 8 & 10.  NDPAC "advocates in favor of limited government, upholding a national commitment to this nation's veterans, and publicly defends the rights of American soldiers," by "rais[ing] and expend[ing] funds in support of candidates for federal office who are military veterans and agree with its values." *Id.* ¶ 12.  NDPAC raises funds pursuant to the amount and source limitations detailed within 2 U.S.C. § 441a and "makes contributions to candidates for federal office up to the applicable limit and makes independent expenditures in support or opposition of candidates." *Id.* ¶ 12.  Plaintiff Kelly S. Eustis is a potential contributor to NDPAC who would like to contribute more than the amount currently allowed toward NDPAC's independent expenditures in federal campaigns. *Id.* ¶ 13.

Plaintiffs complain that §§ 441a(a)(1)(C) & 441a(a)(3) impose unconstitutional limits on amounts an individual may contribute to a non-connected political committee such as NDPAC with respect to independent expenditures.  Citing *Citizens United, EMILY's List,* and *SpeechNow.org*, Plaintiffs dispute the constitutionality of any limit when those contributions are used for independent federal expenditures.  V. Compl. ¶ 13.  Plaintiffs do not contest the Commission's authority to regulate "hard money" under § 441a(a)(1)(A) and (B), which limits contributions to candidates, a candidate's authorized committee, and any political committee established and maintained by a national political party.  *See* V. Compl. ¶ 49.

NDPAC requested an advisory opinion from the Commission on August 11, 2010, pursuant to 2 U.S.C. § 437f, asking whether it would be lawful for NDPAC to accept unlimited contributions for the purpose of making independent expenditures.  V. Compl. ¶ 15.  NDPAC

committed to the limits on contributions made directly to federal candidates; it proposed to separate those "campaign contribution" funds from "independent expenditure" funds by maintaining two separate bank accounts. *Id.* The Commission's general counsel prepared two alternative draft advisory opinions for the Commission's consideration, one of which held NDPAC to the disputed statutory limits under §§ 441a(a)(1)(C) & 441a(a)(3) ("Draft A"), and the other of which held that separate independent expenditures, when wholly separated from hard money contributions, are not subject to contribution limits ("Draft B"). *Id.* ¶¶ 17–18. On September 23, 2010, the six-member Commission failed to issue a binding four-vote advisory opinion, missing approval of Draft A by a vote of 2-3 and missing approval of Draft B by a vote of 3-2. *Id.* ¶¶ 19–20. Commissioner Walther did not vote on either draft. *Id.*, Attach. 1 at 33. As a result, the Commission left NDPAC and Admiral Carey liable for possible enforcement actions against them should NDPAC solicit more than applicable limits currently allowed under §§ 441a(a)(1)(C) & 441a(a)(3) for independent expenditures. Likewise, Mr. Eustis could be liable for a possible enforcement action should he contribute to NDPAC more than the amount currently allowed.

On January 31, 2011, Plaintiffs filed a complaint and motion for preliminary injunction, seeking to enjoin the Commission from enforcing §§ 441a(a)(1)(C) & 441a(a)(3) against Plaintiffs should NDPAC and Admiral Carey solicit and receive contributions in excess of those statutory limits and/or should Mr. Eustis contribute more than currently allowed.

### III. LEGAL STANDARDS

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction is an equitable remedy so its issuance is one which falls within the sound

discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). A plaintiff seeking a preliminary injunction must establish that:

> (a) he is likely to succeed on the merits;
>
> (b) that he is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (c) that the balance of equities tips in his favor; and
>
> (d) that an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008). The D.C. Circuit has further instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

In the past, courts have balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one factor could be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005). *Winter v. NRDC* called this approach into question: "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm [despite finding a strong likelihood of success on the merits] is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 U.S. at 375-76. The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors. *Davis*, 571 F.3d at 1292; *see also Sherley v. Sebelius*, Case No 10-5287, 2011 U.S. App. LEXIS 8686 at *10–11 (D.C. Cir. Apr. 29, 2011). In sum, a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

# IV. LEGAL ANALYSIS

## A. Probability of Success on the Merits

Plaintiffs' probability of success on the merits is the most critical of the criteria when considering a motion for a preliminary injunction. *See Greater New Orleans Fair Housing Action Center, et al. v. HUD*, No. 10-5257, 2011 U.S. App. LEXIS 7138 at *13 (D.C. Cir. Apr. 18, 2011) ("In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits.") (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008)). The Court finds that Plaintiffs have a high likelihood of partial success. "Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *See Citizens United*, 130 S. Ct. at 898. Here, the Government does not succeed in meeting this high burden.

This Court is instructed and bound by the decisions of the Supreme Court and the D.C. Circuit Court of Appeals. The Commission attempts to limit the scope of the Circuit's recent decision in *EMILY's List* without success. The Circuit's ruling was not limited to the authority of the Commission to issue regulations, as the Commission would posit, but included binding precedent on the constitutional rights of non-connected political committees, which the Commission unpersuasively argues is dicta.[3]

---

[3] *See* FEC's Opp'n to Pls.' Mot. for a Preliminary Injunction ("Opp'n") [Dkt. # 11] at 22 ("Alternatively, to the extent that *EMILY's List*'s statements regarding 'hard-money' and 'soft-money' accounts can be interpreted to apply outside the context of mixed federal and non-federal spending to conduct like plaintiffs' proposed expenditures that are *entirely* federal, that limited portion of the majority opinion should be treated as dicta. The suggestion that separate accounts are the constitutionally required solution for addressing possible corruption in the context of a non-profit's *federal* independent expenditures was not necessary to the decision regarding

*EMILY's List* cited critical teachings from Supreme Court precedent:

First, the Court has held that campaign contributions and expenditures constitute "speech" within the protection of the First Amendment.
. . . .

Second, the Court has ruled that Government cannot limit campaign contributions and expenditures to achieve "equalization" – that is, it cannot restrict the speech of some so that others might have equal voice or influence in the electoral process.[4] In perhaps the most important sentence in the Court's entire campaign finance jurisprudence, *Buckley* [*v. Valeo*, 424 U.S. 1, 48-49 (1976)] stated: '[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.'
. . . .

Third, the Court has recognized a strong governmental interest in combating corruption and the appearance thereof . . . . This anticorruption interest is implicated by contributions to *candidates* .
. . .
. . . .

Fourth, in applying the anti-corruption rationale,[5] the Court has afforded stronger protection to *expenditures* by citizens and groups . . . than it has provided to their *contributions* to candidates or parties.[6]

---

whether to strike down Commission regulations for allocation of federal and non-federal spending."). Even if the Circuit's discussion of First Amendment rights were dicta, which it was not, *EMILY's List* would still be persuasive authority.

[4] *See also SpeechNow.org,* 599 F.3d at 692 ("Equalization of differing viewpoints is not a legitimate government objective.")

[5] *See also SpeechNow.org,* 599 F.3d at 693 (noting that *Citizens United* held that the government has *no* anti-corruption interest in limiting independent expenditures); *Citizens United*, 130 S. Ct. at 909 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.").

[6] *See also SpeechNow.org,* 599 F.3d at 692 ("In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court held that, although contribution limits do encroach upon First Amendment

. . . .

        Fifth, the Court has been somewhat more tolerant of regulation of for-profit corporations and labor unions.[7]

. . . .

        To sum up so far: In reconciling the competing interests, the Supreme Court has generally approved statutory limits on *contributions* to candidates and political parties as consistent with the First Amendment. The Court has rejected *expenditure* limits on individuals, groups, candidates, and parties, even though expenditures may confer benefits on candidates.

*EMILY's List*, 581 F.3d at 5-8 (footnotes added).

These principals do not wholly address this case, in which NDPAC wants to make both independent expenditures for federal campaigns with "soft money" and direct contributions to federal candidates and political parties with "hard money." However, from the Circuit's description, NDPAC and EMILY's List are identical in that regard: "EMILY's List is a good example of such a hybrid non-profit: It makes expenditures for advertisements, get-out-the-vote efforts, and voter registration drives; it also makes direct contributions to candidates and parties." *EMILY's List*, 581 F.3d at 12. "The constitutional principles that govern such a hybrid non-profit entity follow ineluctably from the well-established principles governing the other two categories of non-profits."

---

interests, they do not encroach upon First Amendment interests to as great a degree as expenditure limits.")

   [7] At the time of *EMILY's List*, as the Circuit noted, *Citizens United* was pending before the Supreme Court and the limitation on corporate and union expenditures was under review. *EMILY's List*, 581 F.3d at 8 n.6. *Citizens United* overruled *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 902, 905 (1990), "refus[ing] to find a sufficiently compelling governmental interest in preventing the 'corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form.'" *SpeechNow.org,* 599 F.3d at 692 (quoting *Austin v. Mich.*, 494 U.S. at 660).

*Id.*[8]

> To prevent circumvention of contribution limits by individual donors, non-profit entities may be required to make their own contributions to federal candidates and parties out of a hard-money account – that is, an account subject to source and amount limitations ($5000 annually per contributor). Similarly, non-profits also may be compelled to use their hard-money accounts to pay an appropriately tailored share of administrative expenses associated with their contributions. But non-profit entities are entitled to make their expenditures – such as advertisements, get-out-the-vote efforts, and registration drives – out of a soft-money or general treasury account that is not subject to source and amount limits. Stated another way: A non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates. Rather, it simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account.

*Id.* (citation omitted); *see also SpeechNow.org*, 599 F.3d at 695 ("Limits on direct contributions to candidates, 'unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption.'") (quoting *Citizens United*, 130 S. Ct. at 909).

Instead of approving NDPAC's proposal of separate accounts for hard-money and soft-money contributions and expenditures, the Commission would require NDPAC to establish a second formal committee, with its own adherence to existing statutory limits. But *EMILY's List* does not require such a resolution. Nor does the Commission's demand further its stated "compelling interest," *see Citizens United*, 130 S. Ct. at 898 (requiring compelling interest), of anti-corruption; the Commission fails to recognize that non-connected non-profits are *not* the same as political parties and do *not* cause the same concerns of *quid pro quo* money-for-access. *See EMILY's List*, 581 F.3d

---

[8] The Commission frames *EMILY's List* as merely a controversy about allocation regulations concerning payment of administrative expenses. Not so. The Circuit quite expansively addressed First Amendment principles and applied those principles to Emily's List and its various activities.

-11-

at 18 ("Donations to and spending by a *non-profit* cannot corrupt a candidate or officeholder, at least in the absence of some *McConnell*-like[9] evidence establishing such corruption or the appearance thereof."); *id*. at 22 ("The concurrence cites no similar record evidence showing that non-profits sell access to officeholders and candidates in exchange for large soft-money contributions."); *id*. ("In our judgment, '*McConnell* views political parties as different in kind than independent expenditure committees.' *N.C. Right to Life v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008)"). Further, even if some compelling interest were identified, the Commission's proposal is not narrowly tailored to achieve that objective. *See Citizens United*, 130 S. Ct. at 898 (requiring narrowly tailored means to achieve a compelling interest). The Commission's proposal fails to explain adequately why Plaintiffs' proposed separation of accounts does not satisfy the same objective as separate policitcal action committees in a less burdensome manner. Plaintiffs' proposal conforms with the two basic tenets that govern non-connected non-profits' election campaign contributions: (1) "non-profit groups may accept unlimited donations to their soft-money accounts [a]nd . . . may spend unlimited amounts out of their soft-money accounts for election-related activities such as advertisements, get-out-the-vote efforts, and voter registration drives," *see EMILY's List*, 581 F.3d at 14; and (2) "non-profit entities may be required to use their hard-money accounts for their own contributions to candidates and parties and for an appropriately tailored share of administrative expenses associated with such contributions." *Id.* at 16.

NDPAC's proposal would comply fully with *EMILY's List* by establishing separate accounts to (1) solicit and spend unlimited funds for independent federal expenditures (soft money); and (2) solicit and spend statutorily-limited expenses on direct contributions to federal political

---

[9]  *McConnell v. FEC*, 540 U.S. 93 (2003).

candidates and/or political parties (hard money). NDPAC's approach is squarely approved by *EMILY's List*, leading to the inevitable conclusion that NDPAC has a strong possibility of success on the merits.[10] Further, maintaining two separate accounts is a perfectly legitimate and narrowly-tailored means to ensure no cross-over between soft and hard money, as opposed to the Commission's overly burdensome alternative. *See Citizens United*, 130 S. Ct. at 898 (requiring narrowly tailored means to achieve compelling interest).

Plaintiffs' strong possibility of success is limited by the requirement that NDPAC separate its hard and soft money accounts and comply with the applicable "hard money" limits on contributions going directly to federal candidates, their campaigns, and national parties. For this reason, § 441a(1)(C), which deals specifically with contributions to political committees such as NDPAC, and not directly to federal candidates, is clearly free of any contribution limits when the contributions are used for independent federal expenditures. Section 443a(3), however, is a broader provision and Plaintiffs' arguments do not support an injunction against it in its entirety. Certainly, § 441a(3)(A), which limits individual contributions "*to* candidates and the authorized committees of candidates," has a recognized anti-corruption goal and its enforcement by the Commission does not offend Plaintiffs' First Amendment rights. Such contributions raise legitimate anti-corruption concerns, not presented by independent federal expenditures. Subsection (B) of § 441a(3) fails to

---

[10] The Commission's efforts to write away the Circuit's constitutional analysis as dicta, Opp'n at 22, is plain wrong. Judge Brown, in a limited concurrence, said that it was unnecessary for the Circuit to address the constitutional issues since the case could be resolved on statutory bases alone. *See EMILY's List*, 581 F.3d at 25 (Brown, J., concurring). The majority "respectfully but firmly disagree[d]" because "EMILY's List raises a statutory challenge to only three of the five provisions at issue here" and the remaining two could only be addressed by constitutional analysis. *Id.* at 24. Therefore, the Circuit had "no choice but to address EMILY's List's First Amendment argument." *Id.*

distinguish between contributions to unconnected political action committees conducting independent expenditure activities, and contributions to unconnected political action committees for direct contributions to candidates, candidate political committees, and national parties. The former must be permitted without limitation; the latter remains subject to the limitations of the statute.

Therefore, Plaintiffs' motion for an injunction against enforcement of §§ 441a(a)(1)(C) & 441a(a)(3) is likely to succeed, insofar as any contributions to NDPAC used for the purpose of subsequent contributions to candidates, candidates' committees, or national parties remain subject to statutory contribution limits, NDPAC maintains separate bank accounts for its "hard money" and "soft money," and NDPAC proportionally pays related administrative costs from those accounts.

## B. Irreparable Harm

"The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day." *Citizens United*, 130 S. Ct. at 889. But that is what has happened here: because the Commissioners could not agree, the Commission staff has been forced into a crabbed reading of *EMILY's List* and erroneous proposals to avoid recognizing Plaintiffs' First Amendment rights.

The fact that Plaintiffs may have another outlet to exercise their First Amendment rights to free speech–such as the establishment of a separate committee or PAC, as suggested by the Commission in its opposition–does not answer this constitutional challenge. While the Commission might expound on such alternatives, they do nothing to cure the constitutional maladies of its heavy-handed approach. "The fundamental flaw" to the Commission's approach continues to be that it

"improperly '[brings] to bear what was essentially a political party analysis to a non-connected, independent committee which is not under the control of, or associated with candidates in the fashion of a political party.'" *EMILY's List*, 581 F.3d at 15 (citation omitted). Stifling citizens' speech rights during a Presidential campaign runs contrary to the entire history of First Amendment jurisprudence in this country. *See Citizens United*, 130 S.Ct. at 892 ("political speech . . . is central to the meaning and purpose of the First Amendment").

The President of the United States announced his formal bid for re-election in April 2011, a full nineteen months before the November 2012 election. The race is on right now. Whichever candidates Plaintiffs wish to support and issues they wish to espouse must be freed immediately from the chill of possible FEC enforcement. "First Amendment rights are arguably chilled, as long as there is a credible threat of prosecution." *Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 603-04 (D.C. Cir. 1995). Although the Commission suggests that it will probably not enforce its rules, nothing "prevents the Commission from enforcing its rule at any time" and the inability of the Commissioners to vote affirmatively on an advisory opinion presages that possibility.[11]

---

[11] The Commission properly points out that the issue in *Chamber of Commerce of U.S.* was the plaintiff's standing to challenge an FEC rule, not imminent danger of such enforcement. The Commission also concedes, however, "[t]o be sure, a new Commissioner or a change of mind by a current Commissioner could lead to an enforcement action against NDPAC . . . ." Opp'n at 35–36 n.10. The imminence of Plaintiffs' harm here is the onset of the presidential campaign and the muting of their voice that the Commission's position would impose, despite clear Circuit law to the contrary. Notably, when the Commission was considering Plaintiffs' request for an Advisory Opinion, "it appeared that any potential enforcement action against NDPAC would be brought outside this Circuit, in the Northern District of Virginia, where NDPAC resides and is incorporated" and where *EMILY's List* is not binding. Opp'n at 23 n.7. Without an injunction, such enforcement might still proceed in Virginia. To this end, the Court notes the discussion of the Commission's enforcement in *Citizens United* and the need to avoid its entanglements:

In just such an instance, First Amendment case law recognizes that pre-enforcement challenges are entirely permissible, if not welcome. As noted above, political speech is at the very core of the First Amendment. *Buckley*, 424 U.S. at 39. The right to speak effectively would be "diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.'" *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 296 (1981) (quoting *Buckley*, 424 U.S. at 65-66). If the President, the leader of a national political party with deep coffers, believes it is not too late to begin his

---

> [The FEC] regulatory scheme may not be a prior restraint on speech in the strict sense of that term, for prospective speakers are not compelled by law to seek an advisory opinion from the FEC before the speech takes place. As a practical matter, however . . . , a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak. These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century England, laws and governmental practices of the sort the First Amendment was drawn to prohibit. . . .
>
> [*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007)] said that First Amendment standards "must eschew 'the open-ended rough-and-tumble of factors,' which 'invit[es] complex argument in a trial court and a virtually inevitable appeal.'" Yet, the FEC has created a regime that allows it to select what political speech is safe for public consumption by applying ambiguous tests. If parties want to avoid litigation and the possibility of civil and criminal penalties, they must either refrain from speaking or ask the FEC to issue an advisory opinion approving of the political speech in question. Government officials pore over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated. This is an unprecedented governmental intervention into the realm of speech.

*Citizens United*, 130 S. Ct. at 895-96 (citations omitted). Of course, these Plaintiffs attempted to obtain an advisory opinion, only to have the Commissioners refuse.

fundraising and campaigning for 2012, it cannot be too soon for these Plaintiffs to participate in the national discourse, whatever their views; and precluding their speech while this litigation wound to its expected conclusion would impose irreparable harm to their First Amendment rights. The "First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *FEC v. Wisconsin Right to Life*, 551 U.S. at 457. "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people . . . . The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 130 S. Ct. at 898 (citations and quotations omitted).

The Court finds that the political season for the presidential election is already underway and the time to participate is *now*; that Plaintiffs swear by Verified Complaint they wish to participate in that national discourse in multiple ways; that the precedents of this Circuit and the Supreme Court fully support Plaintiffs' position as to both direct candidate contributions and independent expenditures; and that the possibility of Commission enforcement of its contrary position cannot be ignored. Plaintiffs show that the Commission's interference with their First Amendment rights constitutes irreparable harm.

## C. Balance of Harms

Plaintiffs have established concrete plans to engage in a focused independent expenditure campaign as soon as they are legally permitted to do so. The Verified Complaint indicates that "as soon as possible" NDPAC would like to engage in an independent expenditure campaign directed against Anthony Weiner in New York's Ninth Congressional District, by the expenditure of approximately $6,300 (to be contributed by Mr. Eustis) to run a series of advertisements on *Newsmax*, an internet website. V. Compl. ¶ 24. They must refrain from doing

so now because the Commissioners failed to issue a requested Advisory Opinion, which means Plaintiffs face the possibility of civil or criminal liability if they proceed without official government approval.

The Commission responds that Plaintiffs' alleged injuries are neither actual nor certain because they could fund the planned $6,300 advertisement expenditure in at least "four obvious ways:"

- Combine a $5,000 contribution from Mr. Eustis with $1,300 from NDPAC's existing funds;
- Accept $5,000 from Mr. Eustis and combine it with $1,300 from another donor or combination of donors;
- Set up a separate entity that accepts contributions of unlimited amounts;
- Have Mr. Eustis simply pay for the planned ad himself.

Opp'n at 32. Each of these proposals, however, would require Plaintiffs to forego their First Amendment rights that are guaranteed by the Constitution and recognized by this Circuit. The Commission's questioning of Plaintiffs' intentions – noting that NDPAC "has never before in its 11-year history run independent expenditure advertising that in the aggregate exceeded $200 in a calendar year," Opp'n at 33 – is immaterial in the face of Plaintiffs' Verified Complaint. The Court does not assess the credibility of Plaintiffs' sworn allegations, and the Commission's efforts to diminish Plaintiffs' injury by questioning their *bona fides* does not well serve the agency or its argument.

According to the Verified Complaint, NDPAC will maintain separate accounts to (1) collect and expend monies for contributions to federal candidates and party committees; and (2) solicit and expend monies for independent federal expenditure activities. *See* V. Compl. ¶ 59 ("National Defense PAC's contributions to candidates, party committees or the hard money accounts

of other PACs will be made from a separate account comprised of funds received from individuals in amounts of $5000 or less. National Defense PAC will pay the expense of administering its contributions to candidates from the same account. Independent expenditures will be made from a separate account.")

The Commission argues that separate accounts for committees that engage in both "hard-money" and "soft-money" expenditure activities is insufficient to address corruption and the appearance of corruption. Opp'n at 25–26; 37 ("Permitting plaintiffs to fund independent expenditures through an existing political committee that also makes contributions to candidates would undermine the anti-corruption purpose and disclosure requirements in the Act."). This argument cannot overcome direct Supreme Court and Circuit precedent. *See Citizens United*, 130 S. Ct. at 909 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption."); *SpeechNow.org,* 599 F.3d at 693 (noting that *Citizens United* "held that the government has *no* anti-corruption interest in limiting independent expenditures.").[12] Moreover, *EMILY's List* specifically addressed a hybrid non-profit entity that both made independent expenditures and contributed directly to federal candidates, campaigns, and parties – and found no problem. *See EMILY's List*, 581 F.3d at 12.

Plaintiffs seek preliminary and permanent injunctions enjoining the Commission from

_____

[12] *See also Citizens United*, 130 S. Ct. at 913:

> *Austin* is overruled, so it provides no basis for allowing the Government to limit corporate independent expenditures. . . . Section 441b's restrictions on corporate independent expenditures are therefore invalid . . . ."

*Id.* The Commission makes no argument that would distinguish Plaintiffs' independent expenditures from those now allowed by corporations under *Citizens United.*

enforcing §§ 441a(a)(1)(C) & 441a(a)(3) against them with respect only to independent expenditures. Plaintiffs do not contest the Commission's authority to regulate "hard money." *See* V. Compl. ¶ 49. Such a request is fully consistent with the analyses of *Citizens United*, *Buckley*, *SpeechNow.org* and *EMILY's List*, and the Commission can offer no viable public harm to the contrary. As long as Plaintiffs strictly segregate these funds and maintain the statutory limits on soliciting and spending hard money, they are free to seek and expend unlimited soft money funds geared toward independent expenditures. Because neither contribution nor expenditure limitations involving independent expenditure activities are constitutional under the First Amendment, the Commission cannot prevail and the harm falls entirely on Plaintiffs.

### D. Public Interest

"Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people . . . . The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 130 S. Ct. at 898 (citations and quotations omitted). The public interest is supported by protecting the right to speak, both individually and collectively. Here, to protect Plaintiffs' right to engage in political speech through independent expenditure campaigning is fully in accord with the public's interest in free speech and association.

### V. CONCLUSION

Having weighed the factors required to be considered in determining whether to preliminarily enjoin the Commission from enforcing §§ 441a(a)(1)(C) & 441a(a)(3), the Court grants a preliminary injunction as follows: The Commission shall not enforce 2 U.S.C. §§ 441a(a)(1)(C) & 441a(a)(3) against Plaintiffs with regard to independent expenditures, as long as the NDPAC

maintains separate bank accounts for its "hard money" and "soft money," proportionally pays related administrative costs, and complies with the applicable monetary limits of "hard money" contributions. All "soft money" contributions used toward federal independent expenditure campaigns shall be free of any contribution limits. A memorializing Order accompanies this Memorandum Opinion.


Date:   June 14, 2011                          _____/s/_____
                                               ROSEMARY M. COLLYER
                                               United States District Judge